Henry E. Sickles, Referee.
The language of the lease or contract upon which this action is based, as to the duties imposed upon the defendant in the matter of mining coal, is so clear and unmistakable tha,t there can be no reasonable doubt as to its meaning. The defendant, the party of the second part, agrees, “to mine from said land, in the year one thousand eight hundred and sixty-four, not less than ten thousand tons of coal; in the year one thousand eight hundred and sixty-five, not less than ten thousand tons, and twenty thousand in each and every year thereafter. It being understood that the said party of the second part is to pay for ten thousand tons in each and every year, whether the same shall be actually taken out in such year or not, and that in case the maximum quantity of twenty thousand tons is not taken out in one thousand eight hundred and sixty-six or any subsequent year, interest at the rate of seven per centum per annum, shall be paid by the said party of the second part to the said parties of the first part, their heirs or assigns, upon such sums as the deficiency *31 shall amount to, said interest to be continued until the full quantity' agreed to be taken out as aforesaid shall be reached,” provided, “ that the said party of the second part shall have the privilege of taking out, without charge, at any time thereafter a quantity of coal equal in amount to the deficiency they may have paid for in any previous year or years.” •
Then, after providing for certain contingencies, which, if they arise, may terminate or modify the liability of defendant, the contract continues : “ And the said
party of the second part agrees to pay for the coal mined and taken out in pursuance of this agreement at the rate of twelve and a half (12') cents for every ton of (2240) twenty-two hundred and forty pounds of clear merchantable coal, exclusive of culm or mine waste, that will pass through a mesh of one half inch square.” .... “And it is further understood and agreed that if the said party of the second part elect to do so, they may increase the quantity beyond that stipulated to be mined in any one year, and, at their option may diminish the quantity for any succeeding year or years by an amount corresponding with such increase ; provided that the quantity mined shall not be less in the aggregate than as hereinbefore stipulated.”
No ingenuity of argument will change the meaning of this language. The defendant obligates itself to mine not less than ten thousand tons of coal for the first two years and not less than twenty thousand tons thereafter. If it fails so to do, provision is made for indemnity to the plaintiff for the breach. The defendant does not obligate itself to mine more under any circumstances, but, in precise and emphatic phrase, limits its liability to that amount. It has the privilege to mine more, but if it avails itself of that privilege, the excess is first to be applied to make up deficiencies, if any, for former years, and then, if there is still an excess, it has the option to diminish the quantity (i. e., to mine less than the prescribed quantity) “ for any succeed *32 ing year or years by an amount correspondent with such increase.” In other words the defendant has the privilege of mining more than an average amount of 20,000 tons per year (after the first two), which it absolutely agrees to mine, but carefully limits its liability to that amount. There are no words which expressly or by implication require the defendant to mine with reasonable diligence, and to import them into the contract would be to materially vary and modify it, and this may not be done however conclusively the plaintiff may be able to make it appear by parol evidence that defendant’s officers and agents did in fact agree to so mine.
The old common law rule, that parol evidence is inadmissible to vary or modify, to add to or take from the terms of a written contract, is still preserved in all its vigor in this state. There are very many cases which it is claimed have established exceptions to or modifications of the rule. But these exceptions and modifications are more apparent than real, they simply define its boundaries and exclude from it matters which are not included in its words.
Thus, if the language of a contract is ambiguous, resort may be had to the surrounding circumstances, and sometimes to the statements of the parties, not to vary the terms of the instrument, but to show in what sense the parties understood them. Where the words of a contract are plain, their meaning unmistakable, and they are conclusive as to the intent, no resort may be had to the circumstances or the statements to show that the parties really intended something else, except where a reformation of the contract is sought for because of mistake or fraud.
The question has been very frequently before the Court of Appeals of late, and without citing a long array of authorities, it will be sufficient perhaps to quote from the opinion of Andrews, J., in Corse v. Peck, decided in June last and not yet reported, to show the position of the court. He says, “ The rule that parol *33 evidence is inadmissible to add to or vary the terms of a written contract precludes evidence of the negotiations which preceded, or conversations which accompanied, the making of it, unless necessary to explain ambiguous provisions the meaning of which cannot be ascertained by an inspection of the wuitten instrument.” See also Snowdon v. Guion, 101 N. Y. 458, 462.
So, too, it has been held that the rule does not apply where the original contract was verbal and part only has been reduced to writing, or to collateral undertakings.
But where the written contract indicates that it was the intention and design to express therein the-whole contract between the parties, it is conclusive. As said by Finch, J., in Eighmie v. Taylor, 98 N. Y. 288, 294: “ If we may go outside of the instrument to prove that there was a stipulation not contained therein and so that only part was put in writing, and then because of that fact enforce the oral stipulation, there will be little of value left in the rule itself.”
It is claimed on the part of the plaintiff that at least so far as the testimony of what occurred between her agent and defendant’s president at the time of the delivery of the contract is concerned, it.is competent, and that defendant is bound thereby.
1st. That it was the interpretation put by the agents of the parties, who acted for them, upon the contract, and that the parties are thereby estopped from disputing it or claiming that the contract reads otherwise. In other words, the argument is that, however clear and unambiguous may be the language of a contract, it is proper to show that the parties in considering its terms orally agreed that it should mean something else, and that something else must take the place of the words of the contract, and thus an entirely different contract be established. When the courts go" thus far, from that moment the rule considered so important, so carefully laid down, ceases to exist.
*34 2d. It is claimed that as the contract was delivered only in reliance upon the promise of defendant's agent that they would work the mine industriously, “work out the greatest quantity of coal,” that /this was enforceable as a separate and independent agreement. Such a parol agreement, to be enforceable, must be consistent with the terms of the written contract, not directly antagonistic to and subversive of it. The cases cited by the learned counsel for the plaintiff go no further than this. I listened with interest to his ingenious and able argument, and perused with care his exhaustive brief, and would not have been displeased could I have had pointed out to me some practicable way to avoid the rule, as there is an apparent equity in her case. But I find none in the argument or brief, and the oral evidence must be rejected unless another position counsel takes is maintainable, and that is—
3. This is a Pennsylvania contract, and its construction must be governed by the laws of that state, and in that state written contracts may be changed or modified by parol evidence. It is not claimed that there is any statute in Pennsylvania which controls the subject, but that it is a modification made by the courts of that state of the common law rule. There are cases in that state as in this, where, to prevent the doing of an injustice, the courts have been ingenious in avoiding the rule and in discriminating between it and the case under consideration. But there were none called to my attention which go to the length necessary to aid the plaintiff here.
But, again, the question depends upon a rule of procedure, i. e., as to the reception or rejection of evidence, and this is a field into which the laws of another state cannot intrude; it is to be determined exclusively by the laws of this state.
I am constrained, therefore, to grant the motion to strike out the testimony objected to as to the negotiations and conversations preceding, and those accompany *35 ing, the delivery of the lease, and as to the first count to dismiss the complaint.
The motion to dismiss as to the second count is denied. There is some evidence tending to show that defendant has exceeded the rights given to it by the lease, extensive as they are. It would not be profitable to discuss this evidence for the purpose of determining the particulars in which plaintiff’s rights have been violated, the extent of such violation, or, perhaps, to determine definitely that a cause of action had been absolutely established. Suffice it to say there is evidence tending to establish a cause of action and which will not justify a nonsuit.
The referee also delivered the following opinion in his decision as to the second cause of action:—
Henry E. Sickles, Referee :
The causes for complaint for alleged illegal action on the part of defendant for which plaintiff seeks redress under the second count of her complaint are threefold.
1st. That defendant has, instead of using the privileges which were granted to it solely for the purpose of enabling it to carry out the provisions of the contract Exhibit “ A,” in regard to the mining of the coal on plaintiff’s land, exclusively, or principally for that purpose, has unlawfully used them for the mining of its own coal, and this to such an extent that it has seriously interfered with the work to aid in which they were granted.
2d. That defendant has excavated and is using a gangway connecting the Marvin shaft with defendant’s other collieries, not for any object or purpose connected with the mining of the coal in plaintiff’s land, but mainly for the purpose of draining the water from the other collieries down upon plaintiff’s land, and thus is imposing a burden upon the said land not authorized or contemplated by the contract.
3d. That defendant is piling the culm or refuse coal *36 arising from the coal mined from its land upon the surface of plaintiff’s land, thus appropriating and using so much of the surface for its own purposes which is not needed or used for the purpose for which alone defendant is entitled to use any portion of the surface. The facts alleged are established by the evidence, and I am satisfied that by no reasonable construction of the instrument, Exhibit “A,” is the use thus made of plaintiff’s property and the burdens so imposed upon it warranted or authorized thereby, and neither the able arguments of defendant’s counsel nor a careful perusal of the 'learned and exhaustive brief furnished by them and examination of the authorities cited have convinced me to the contrary.
1st. That the object the parties had in view in entering into the contract Exhibit “ 4,” at least so far as appears from the terms and provisions thereof, was the mining of coal that might be found in plaintiff’s land; that the rights and privileges granted by plaintiff to defendant were merely as incidents, and were designed to be limited to the actual requirements for a successful accomplishment of that purpose can scarcely be successfully disputed.
The plaintiff grants to defendant the right, and defendant assumed the obligation to mine all the coal in said land which can be economically mined, and to enable the defendant to exercise this right and to perform its covenants, plaintiff grants to it the right of way for all “railroads, .... slopes, tunnels,” etc., it “may find necessary to construct across or upon said tract with the right to erect dams upon the surface for the proper mining of said coal, also the use of land for digging all air shafts that they (i. e., defendants) may consider necessary, with the right to dig the same, also the use of all the land they may require for the purpose of erecting .... buildings they may deem necessary for the prosecution of their business, together with land for piling coal or culm, and all other appurtenances they may *37 require for mining .... preparing and forwarding the coal to be mined under this agreement.”
By the very language of the agreements the rights and privileges are limited to the necessities of the work contemplated. It may be conceded, as defendant’s counsel claim, that defendant is the sole and exclusive judge as to what is necessary, but in determining that question it may look only to this work. It is not authorized to take into consideration any other object or purpose. If it did consider or was influenced in its determination by other purposes connected with its adjoining property, it was not authorized by the contract, and was a breach of good faith. When, therefore, defendant sunk the Marvin shaft, and erected the breaker and other buildings, its officers through whom it acts, virtually announced to plaintiff, “we consider works-of this size and capacity necessary for the successful and profitable mining of the coal in your land as rapidly as w'e propose to mine it,” and inasmuch as the shaft and breaker, etc., were clearly and admittedly of much greater capacity than would be required for the mining of the twenty thousand tons per annum, which defendant bound itself to mine and to which it limited its obligation, their construction was an announcement to plaintiff that defendant had elected to avail itself of the option given to it to mine a greater quantity. Plaintiff, therefore, had a right to assume that defendant intended and good faith required that it should use the shaft and structures, primarily, at least, for the mining of the coal in her land. Plaintiff was interested in having this coal mined as rapidly as possible, and the greater the capacity of the structures, so long as they were no greater than was necessary for this purpose, the better it suited her interest. The fact, therefore, that plaintiff did not object to the sinking of a shaft and the erection of a breaker of the size and capacity of the one in question was not a concession of a right to exceed the necessities of the case. It seems to me justice and equity entitle her to insist that inasmuch as *38 defendant has, in the exercise of its right to determine what those necessities require, determined that these structures were necessary for the mining of the coal, in her land, it is estopped by that determination, and may not now claim that they were in fact much larger than were necessary, and so that it could use them for purposes of its own without interference with the proper and expeditious mining of plaintiff’s coal. It remains, then, to be seen, whether the contract gives to defendant a right to use these structures for mining of coal on its own land where it does interfere with the mining of plaintiff’s coal; in fine, whether defendant has the right to elect so to do, provided it pay the royalty on twenty thousand tons per annum to stop entirely the mining of coal on plaintiff’s land and to use the structure it has erected and the excavation it has made exclusively for mining its own land, as, if the argument of defendant’s counsel is tenable at all, it must go to this extent. A right so inconsistent with the spirit and intent of the contract, so subversive of its purposes, should be based on clear and unmistakable language in the contract. It is claimed to exist under this clause therein, “ and it is further agreed and understood that the party of the second part .... may use and occupy the rights and privileges hereby granted and the openings, buildings, fixtures and appurtenances made and constructed by them for the mining, preparing and forwarding coal under this agreement, for the mining, preparing and forwarding coal from any adjoining or contiguous lands until all the land they desire to take coal from and that can be mined and taken out through said openings, shafts and slopes shall be exhausted.” ■ Following this is this provision, “That the party of the second part .... shall have the right to rebuild, reconstruct or remove any and all the buildings, fixtures.. . . . and improvements during the continuance of this agreement and until the coal in the adjoining and contiguous lands that can be worked from those openings, shafts, *39 slopes and tunnels shall have been worked out.” These two provisions are at the end of the contract after full provision has been made for the mining of all of the coal on plaintiff’s land that defendant obligates itself to mine, and after full provision is made for the termination of its obligation in this respect. The language of the two clauses, as well as their position in the contract, instead of conveying by any reasonable construction the idea that the rights thus granted were to be exercised while the obligations imposed upon defendant as to the mining of the coal in the land in question remained unfulfilled and in force and while they would interfere with or retard that work, indicate that they were to be exercised only after the main purpose of the contract was substantially carried out and accomplished, and inasmuch as only rights and privileges necessary for this work are granted, they cannot well be used during the prosecution of the worlc for other purposes without interfering with and retarding the work. That the purpose in view in making the contract had been subordinated to defendant’s other purposes and that the rights and privileges granted solely as aids to the accomplishment of that purpose have been used principally for the mining of coal on defendant’s other land and for the benefit of its other collieries cannot be disputed. Defendant has mined up to May 1, 1886, through the Marvin shaft 497,614 tons of coal from plaintiff’s land and 608,771 from its own. In November, 1886, the last month for the working of which an account was presented, it mined 3,027 tons from plaintiff’s land and 9,609 tons from its own. It did mine in one year from plaintiff's land over .89,000 tons, thus showing its capacity in that respect", and yet the average output is only about one half that amount, and is growing gradually less, while that from defendant’s land is increasing-. -
But, it is urged by defendant’s counsel, the company mined and has paid to plaintiff the royalty on more *40 than the quantity oí coal it obligated itself to mine from her land and therefore she has sustained no damages and is entitled to no relief. Plaintiff has submitted to the imposition of heavy burdens upon her land under the supposition, as I have attempted to show, that they were to be used for her benefit. That they would have been so used to a much greater extent, at least, than they have if defendant had not assumed to use them to such an extent for its own purposes, is very clear, and if it is permitted to continue such use the inducement will always be to subordinate the interests of plaintiff to its own, to mine the coal upon which it pays nothing in preference to that upon which plaintiff is entitled to royalties, and it is in precisely such a case where plaintiff cannot be compensated in damages for the injury inflicted upon her that the aid of a court of equity may be invoked. If defendant be prohibited from exceeding the privileges granted to it by the contract, the temptation to make the plaintiff’s interest subordinate to its own will be removed. If it had worked the colliery to its full capacity in mining the coal in which plaintiff is interested, it might, perhaps, have urged with plausibility that it should not be restrained from mining what coal could be mined from its own land through the shaft and breaker without interference with such working. But as it has not shown a disposition to thus work the colliery, it cannot complain if it be confined to the exercise of the privileges granted by the contract. It seems to me, therefore, that defendant is equitably entitled to a judgment restraining defendant from using the shaft, breaker, etc., for mining its own coal until the coal in plaintiff’s land, so far as defendant is bound to mine it, is removed.
2d. The gangway driven to connect the Marvin with the Leggetts Creek and the Van Storch shafts coneededly was not excavated for the purpose of mining the coal in question. According to defendant’s testimony, it was in the first place designed to serve as a second *41 opening to comply with the requirements of the Pennsylvania laws enacted some ten years after the execution of the contract, and then, it having been discovered that it could be used advantageously for that purpose, it was arranged and finished so as to serve as a drain to bring the waters collecting in the other two collieries down to the Marvin shaft, thus saving to defendant the expense of running the pumps in the other collieries. Defendant claims the right to do this: 1st. Because it owns the vein of coal in plaintiff’s and the adjoining lands, and had the right to drive the gangway through it for any purpose it deemed it best so to do. 2d. Plaintiff has- no remedy if, in the ordinary course of mining the water is discharged upon her land. It is' not necessary to dispute the proposition that defendant is by the contract in question made the owner of the coal. Conceding this for the purpose of the argument, plaintiff still remains the owner of the layers of earth and rock between the veins of coal. Defendant excavated down to the layer under the fourteen-foot vein, and so discharges the water upon plaintiff’s land. The gangway was not made in the ordinary course of mining, and so the authorities cited which hold that in the ordinary course of mining, coal or minerals may be taken up the line of the adjoining land, that a party is not bound to have a barrier to prevent the water from flowing into the mine of an adjoining owner. But this was not done in the ordinary course of mining, and I have yet to learn of a decision holding that a person may lawfully dig a ditch upon the surface of his land so as to gather the surface water thereon and discharge it upon the land of his adjoining neighbor, or may drive a gangway from his mine to the line of an adjoining owner for the purpose of discharging the waters collecting in his mine into that of the adjoining owner. The authorities cited by defendant’s counsel sustain no such doctrine. In one of them, P. & R. C. & I. Co. v. Taylor (Legal Chronicle, 36), is cited with approval a clause in *42 the opinion in the case of the Mammoth Vein Consolidation Company’s Appeal (4 P. F. Smith [54 Pa. $£.] 183, 189), as follows : “ Had it been manifest that the consequence of defendant’s operations would have the effect of letting water in large quantities into plaintiff’s mine, it would assuredly have been proper to have enjoined them even although they were operating exactly within the terms of the lease.” In that case a motion for a preliminary injunction was denied, but the court say that if it appears on the trial that the danger exists it can be guarded against by the judgment. Another case is also cited. Mountain Coal and Iron Company (Legal Intelligence, March 29, 187 ), which holds as follows: “ Where the miner in his upper mine in carrying forward his gangway strikes into a breast which has been wrongfully worked by a trespasser up the dip of his coal vein, he is not justified in emptying the water flowing down the drain or gutter of his gangway into the opening thus struck, if by reasonable means he ca.n carry the water into his own dump ; ” that it was the duty of the upper owner to carry off the water even though a trespass had been committed upon him. The court say: “ To adopt the principle that the upper owner is liable for no act done within his own mine and no neglect because it falls within his own property right would lead to results. disastrous to mining and cannot be tolerated.”
It is hardly necessary, however, to cite or discuss authorities. Suffice it to say none go to the extent necessary to sustain defendant’s contention. But it is urged the use of the gangway as a drain is a great convenience and benefit to defendant and is no injury to plaintiff. This is hardly an excuse for an unlawful interference with another’s rights. But if no serious damage has thus far been occasioned, such damage may result at any time. If the pump in the Marvin shaft should become disabled, or the working thereof should cease because of a strike, a contingency not altogether *43 improbable in these days, or from any other cause, the water that is being poured down from the defendant’s other collieries into the Marvin shaft would soon flood that colliery and for a time utterly prevent the mining of coal therefrom. ' Defendant has no right to impose this burden and this risk upon plaintiff and she has a right to ask that it be restrained from so doing.
3d. The right claimed by defendant to deposit all of the culm or waste coal arising from the coal mined through the Marvin shaft from defendant’s adjoining land upon the surface of plaintiff’s land as well as that coming from the coal mined from her own land, seems to me an extraordinary one. If it be true, plaintiff in executing the contract virtually surrendered all right to the surface of her land and cannot safely sell one foot of it. It appears that defendant has from 800 to 1000 acres of land adjoining plaintiff’s land, the coal from which can be mined to advantage through the Marvin shaft. The coal from “ the farm ” which contains 500 acres can be mined in no other way unless a new shaft is sunk, and it is the evident purpose of defendant to mine it all through the Marvin shaft. A very moderate estimate of the coal from defendant’s adjoining properties already and hereafter to be mined through the Marvin shaft is 20,000,000 tons, add to this say 3,000,000 tons for the coal from plaintiff’s land the whole amounts to 23,000,000 tons. There has already been mined 1,100,000 tons. The culm from this covers seven acres and seventeen perches of land to a depth of between forty and fifty feet. If the balance yet to be mined" yields culm in anything like the same proportions, it would cover the whole surface of plaintiff’s land not used by defendant for other purposes to a depth of, at least seventy feet. If then, defendant has the right claimed it has the right to appropriate the whole surface. The language of the contract must be strong and unequivocal indeed, which will authorize a court to arrive at a result so disastrous, and yet the claim is *44 based simply upon a grant of the right to use so much of the surface as shall be necessary for the deposit of the culm from the coal mined from plaintiff’s land. The provision of the contract authorizing the use of the rights and privileges granted for purposes connected with the mining of the coal from its own land, does not purport to extend the right granted so as to make it cover land not necessary for the purposes specified. Now there is a marked distinction between the use of the surface for the deposit of culm and the use for other purposes connected with mining. For the latter the use is but temporary and the portion taken when not being used for purposes connected with mining plaintiff’s coal may be used for mining that of defendants’ without imposing an additional burden, and the portion required to be taken must be a matter of judgment. But the necessity to take land for the deposit of culm only arises as the culm is produced, and the use of the land taken for it is in effect a permanent appropriation as the land is rendered valueless for building or other purposes. It can scarcely be claimed that defendant has the right at the outset to mark out and appropriate all the land it may deem necessary to use even for the deposit of cidm from plaintiff’s coal. Until needed plaintiff has the right to use it. If any culm arising from any other coal is deposited on plaintiff’s land, then so much space which might have been used for the deposit contemplated by the contract is otherwise appropriated, and so much additional land must be taken which would not have been required had the land so appropriated been used for the deposit of the culm from plaintiff’s coal; certainly, if I am correct in my first proposition, if defendant is not authorized to mine its own coal through the Marvin shaft until it has performed its contract as to mining plaintiff’s coal, when that is done the quantity of land required for the deposit of the culm therefrom will be definitely determined and no more can be taken. Nor is it necessary *45 to enable defendant to use and enjoy the rights and privileges granted, to impose this heavy burden upon plaintiff’s land. The Marvin shaft is located near the Lackawanna river, on the opposite side of which lies the defendant’s “farm.” By building a bridge across the river, access can be had to the farm and a convenient dumping place for its own culm can be reached.
It seems to me, then, as there is no express grant to defendant in the contract of a right to deposit culm arising from the coal mined in its own land, upon the surface of plaintiff’s land, as no such deposit can be made without appropriating land not necessary for the deposit of culm from coal mined under the contract, and as, so far as this question is concerned, the right to use only so much of the surface as is necessary for that purpose is granted, defendant exceeded the rights granted and was guilty of a trespass in depositing the culm from its own properties upon plaintiff’s land, and to the extent of the injury thus inflicted, it is liable, and plaintiff is entitled to judgment restraining any such further, unlawful use of her land, it appearing that such use is contemplated and the right thereto asserted.
It does not appear in the case what is the usual or reasonable height to which deposits of culm are, or should be carried. It may, peihaps, be inferred from the testimony that more culm may yet be deposited on the land already appropriated for that purpose. It does appear that the surface so covered is rendered useless, that it was worth $1,500 per acre, that a little over seven acres have been covered with the deposit, that about six elevenths of such deposit was made without right, and perhaps it would not have been unreasonable to have allowed to plaintiff by way of damages the full value of six elevenths of the land taken; I have concluded, however, to allow $3,000, the value of two acres, and, if I am right in my views as to the construe *46 tion of the contract, this cannot be considered an excessive allowance.
George G. Genet, attorney and of counsel .for plaintiff as appellant and respondent, among other things, argued:—
The complaints should not have been dismissed as to the first cause of action.
The parol evidence that both before the agreement was executed and after it was executed but before it was delivered, defendant agreed to work industriously and take out the greatest quantity of coal, and that plaintiff should profit by it as much as possible, was admissible. The agreement was executed solely in consideration of the promises and delivered solely on the renewal of the promises made at the time it was delivered. Morgan v. Griffith, 6 L. R. Ex. 70; Lindley v. Lancey, 17 C. B. N. S., 578; Harris v. Rickett, 4 H. & N ; Jarvis v. Berridge, L. R. 8. Ch., 351; Erskine v. Aldene, L. R. 8 Ch. App., 764, 766 ; Hope v. Balm, 58 N. Y. 381; Lewis v. Seabury, 74 Ib. 413;.Silliman v. Tuttle, 45 Barb. 171; Lythe v. Bass, 7 Colden Tenn. 303; Wallis v. Little, 11 C. B., N. S., 369; Winn v. Chamberlain, 32 Vt. 318 ; Cowen & Hill’s Notes, Note, 295; Hope v. Balm, 58 N. Y. 380; Lewis v. Seabury, 74 Ib. 413 ; Wilson v. Deen, 74 Ib. 531; Snowden v. Guion, 101 Ib. 462; Chapin v. Dobson, 78 Ib. 74; Eighmie v. Taylor, 98 Ib. 294; Remington v. Palmer, 62 Ib. 32; Stockwell v. Holmes, 33 Ib. 53; Van Buskirk v. Roberts, 31 Ib. 661; Murdock v. Gilchrist, 52 Ib. 247; Murray v. Smith, 1 Duer. 427 ; 12 Wend. 446 ; 1 John Cas. 22; 4 Duer, 292; 1 Hill, 383 ; 49 Barb, 264. A contract is to be interpreted in the sense in which plaintiff understood it and in the light of surrounding circumstances. White v. Hoyt, 73 N. Y. 511. Most favorable to the promisee. Hoffman v. Etna Ins. Co., 32 N. Y. 405. In the sense in which the promisor knew the promisee understood it. Johnson v. Hatborne, *47 2 Abb. Dec. 469; Barlow v. Scott, 24 N. Y. 40; Mowatt v. L’Lonesborough, 3 E. & B. 307; Potter v. Ontario Ins. Co., 5 Hill 147. The nature of all mining contracts is such as to make time essential. Pendergast v. Teuton, 1 Y. & C. C. O. 110, 111; Clegg v. Edmonson, 26 L. J. C. 681. Agreement for lease, no certain term agreed on only tonnage, the tenant is bound to begin working immediately, and to proceed without intermission. Sharp v. Wright, 28 Beavan 150. Where a lessee fraudulently delayed digging a certain quantity of coal to avoid the beginning of payment of rent. Green v. Sparrow, cited in 3 Swanston, 407; Wood v. Copper Mines Co., 7 C. B. 906; 18 L. J., N. S., C. P. 293. The intention was sufficiently apparent although there was no express covenant to supply the coal, and amounted to a covenant. Bainbridge on Mines, 272; Watson v. O’Hara, 6 Watts Pa. 362; Lyon v. Miller, 24 Pa. R. 342.
Where a contract contains stipulations in favor of one party and not of the other, as for instance an option, or is in any wise unilateral, the court if it does not consider time as of the essence of the contract will look at any delay in the party in whose favor the contract is binding with especial strictness. Brook v. Gunod, 27 L. J. C., 226; Booth v. Cleveland Mills, 74 N. Y. 23-25.
This promise was binding upon defendants as a collateral agreement in relation to tons of coal not embraced in the minimum and also as a promis'e. in relation to future action depending on contingencies.. See cases above cited; Also Bute V. Thompson, 13 M. & W., 487; Rex v. Budworth, 8 East 387; Jervis v. Thompson, 1 H. & N., 195; 26 L. J. Ex. 41.
The defendants below cited Schulz v. Bradley, 57 N. Y, 646. A valid executory contract for the sale and delivery of a specific quantity of merchandise, cannot be altered by a parol agreement, increasing the quantity to be delivered, and so engraft it on the original *48 contract, as to escape or evade the rule prescribed by the statute of frauds. This does not meet the present case, because the plaintiff in consideration of the promises, covenants, etc., contained in the agreement leases to defendants all the coal contained in upon and under, etc., supposed to be contained in certain veins, but in any event to include all the coal that "can be economically mined, etc., they also are given the right to sink shafts, build railroads, etc., to mine the coal under the agreement and are to pay 12’ cents a ton, etc., limiting their express liability to the payment of $1,250 a year, and interest on $1,250 more after two years as a fixed or ground rent, the rest to depend on contingency of the coal being found.
The difference between the cases of Wheatly v. Westminster Coal Co., L. R. 9 Eq. 538; Jegon v. Vivian, L. R., 6 Ch. App. 742, 757, and McIntyre v. McIntyre Coal Co., 14 N. Y., 264, and the suit at bar is obvious. Those leases were for years and the coal if not mined would revert in time to the owner who would also have the price of it. In each case the court was particular to base its judgment on the proposition that it would work no injustice to the plaintiff, and the extent of the agreement was the minimum rent and there was nothing before the court but the naked contract. In the case on trial there is no reversion. The agreement is not for years, but is an irrevocable license embracing all the coal upon the property that can be economically mined. It cannot be confined to the minimum rent, which would not embrace all the coal on the property. As to the coal beyond the minimum quantity each day’s delay in mining it is a loss to plaintiffs and no benefit to defendants. The agreement embraces not only the minimum quantity, but coal beyond the minimum quantity—namely, all the coal on the property, found to be three million tons. In respect to this there is an implied promise to mine it and pay for it with reasonable diligence, which involves the further duty of mining the minimum quantity, or *49 at least working the property with reasonable diligence. Again if the minimum quantity stated is the extent of defendant’s obligation then the parol evidence as to the coal to be mined beyond the minimum was proper to be received as evidence relating to an independent collateral promise not comprised in the terms of the contract and certainly not contradicting it.
I. The coal in the different veins therefore did not vest in defendant in fee, or in any other way than what is known in law as a mining privilege or license. Stephens v. Santee, 49 N. Y., 37; Joice vc. Andrews, 4 Seld. 291; McDonald v. Hewitt, 15 John. 349; Evans, V. Harris and cases, 19 Barb., 416 ; Andrews v. Durant 11 N. Y., 35; Jackson, v. Hunt, 11 Wend. 137; Merritt v. Johnson, 7 John. 473 ; Gregory v. Stryker, 2 Den. 628; Hurd v. Cook, 75 N. Y. 459; Muchlow v. Bayland, Taunt. 318.
II. At the close of the case, defendant’s counsel cited several cases which they claimed sustained some of their extreme propositions of law. Jigon v. Vivian, L. R., 8 Ch. App. 742; Lewis v. Fothergill, 5 Ib. 110; Smith v. Kenrich, 7 C. B. 573. An examination of the cases will show they do not. The first case above cited shows, however, that this lease does not give them any of the rights they , claim. (The point also contained an elaborate discussion on the effect of the provisions of the lease and of the evidence.—Reptrs.)
Mathews & Smith, attorneys, and Mathew Hale and Frank E. Smith of counsel for defendant, as appellant and respondent, among other things, argued:—
I. The parol evidence offered by plaintiff was properly excluded. Wilson v. Dean, 74 N. Y. 531; Eighmie v. Taylor, 98 Ib. 288; Marsh v. McNair, 99 Ib. 175; Corse v. Peck, 102 Ib. 513 ; Long v. Millerton Iron Co., 101 Ib. 638. There are two classes of cases which are excepted from the operation of the rule : First, when it *50 was mutually intended that the writing should contain a part only of the agreement, and such purpose is apparent on the face of the writing; and second, when the parties have, at the same time and upon the same consideration, negotiated by parol another agreement, which is collateral and on a subject distinct from that to which the written contract relates. Eighmie v. Taylor, supra; Naumberg v. Young, 44 N. J. Law, 331.
It cannot be claimed that the writing here in question falls within either of these exceptions. It has also been urged as a ground for admitting the parol testimony which was offered by the plaintiff that the promises sought to be proven were made after the writing had been signed and sealed, but before it was delivered, and it is claimed that promises so made are excepted from the operation of the general rule. One of the arguments to support this claim is that such a promise cannot, in the nature of things, merge in the writing, since at the time the writing was prepared and executed the promise had not been made. The effect of this claim, if sustained, would be to allow a condition not contained in the contract, to be annexed by parol evidence to the delivery of it, when such delivery was direct from one party to the other. This cannot be done. Worrall v. Munn, 5 N. Y. 229; People v. Bostwic-k, 32 Ib. 445; Cocks v. Barker, 49 Ib. 107; Van Bokkelen v. Taylor, 62 Ib. 105; Wilson v. Dean, 74 Ib. 531, 537; Ridgway v. Bowman. 7 Cush. 268; Bast v. Bank, 101 U. S. 93. The only other ground upon which it is claimed that the parol evidence should have been received is that the writing in question is a Pennsylvania contract; that the common law rule excluding parol evidence has been much relaxed in that state, and that the rules of evidence in force in that state should be applied in this action. There is no foundation for either one of the propositions involved in this claim. (1.) The rule of evidence is substantially the same in Pennsylvania that it is here. . Martin v. Berens, *51 67 Penn. 459; Bast v. Bank, 101 U. S. 93. (2.) The question, relating as it does to the admissibility of evidence, depends solely on the law of the forum—in this case the state of New York. Story, Conflict of Laws, § 634 (a), § 635 (e), Bain v. Whithaven Co., 3 H. of L., cases 1, 19. Even if the rule were otherwise, the plaintiff could only have availed herself of it by proving the law of Pennsylvania as a fact. This she did not do. The law of that state, therefore, must be presumed to be the same as that of the state of New York. Cheney v. Arnold, 15 N. Y. 345, 353; Monroe v. Douglas, 5 Ib. 448; Savage v. O’Neill, 44 Ib. 298; Rice v. Harbison, 63 Ib. 493; Chapin v. Dobson, 78 Ib. 74, 79.
II. The first cause of action was properly dismissed. After the parol evidence given by Mr. Genet of conversations had with the president and general manager of defendant had been stricken out, there was absolutely nothing left to sustain, the allegations of the first count of the complaint. All the testimony which plaintiff desired to offer .in support of her case was received and is contained in the record now before the court. So that even if a large part of that testimony were erroneously stricken out, it is nevertheless apparent that, had the motion to strike out been denied, the first cause of action must have been dismissed. (1.) The contract set out in the first count of the complaint is void under the statute of frauds, as a contract which by its terms is not to be performed within one year. It is not claimed that there was any written memorandum of this alleged contract. Performance, upon the allegations of the complaint, could not be completed in less than forty years. Such a contract is within the statute. Boydell v. Drummond, 11 East 142; Day v. N. Y. C. R. R., 31 Barb. 548; McPherson v. Cox, 96 U. S. 404, 416. The contract sued upon being within the statute is absolutely void and cannot be enforced, directly or indirectly. 2 R. S. 135, § 2, sub. 1. Dung v. Parker, *52 52 N. Y. 494. Nor does performance by the plaintiff take the case out of the statute or enable her to maintain any action on the contract to recover damages for its breach. Broadwell v. Getman, 2 Den. 87; Kellogg v. Clark, 23 Hun 393; Marcy v. Marcy, 9 Allen 8; Frary v. Sterling, 99 Mass. 461; Baldwin v. Palmer, 10 N. Y. 232 ; Van Alstyne v. Wemple, 5 Cow. 164; Harsha v. Reid, 45 N. Y. 415; Cagger v. Lansing, 43 Ib. 550; Levy v. Brush, 45 Ib. 589; Emery v. Smith, 46 N. H. 151; Peirce v. Paine, 28 Vt. 34; Bartlett v. Wheeler, 44 Barb. 162. (2.) The parol promises, sworn to by the plaintiff’s witness, were not, if made, the promises of defendant. It is well settled that the president or general manager of a corporation has no power by virtue of his office to make contracts for the corporation, except such as occur in the ordinary every-day business of the company. Pierce on Railroads, p. 34; Hoyt v. Thompson, 5 N. Y. 320; Risley v. I. B. & W. R. R. Co., 1 Hun 202; Olcott v. Tioga R. R. Co., 27 N. Y. 546; Farmers’ Bank v. McKee, 2 Penn. 318 ; Hendrickson v. N. Y. & A. R. R. Co., 10 Weekly Dig. 33. (3.) No covenant can be implied into the lease to work the mine to its utmost capacity, or even to work it industriously. The written contract contains an express covenant as to the quantity of coal to be mined in each year. There is therefore no room for any implied covenant relating to the same matter; expressum facit cessare taciturn. The written instrument also provides for the payment of a dead rent—i. e., rent to be paid whether the mine is worked or not. It has been decided that in such a case, the lessee, paying the dead rent, is under no obligation to work the mine at all. Wheatley v. Westminster Brymbo Coal Co., L. R. 9 Eq. Ca. 538, 552; McIntyre v. McIntyre Coal Co. 105 N. Y. 264, 272; MacSwinney on Mines, pp. 228, 229; Newell v. Wheeler, 36 N. Y. 244.
I. Defendant is entitled to use the “ Marvin shaft” and its appurtenances for the purpose of mining coal *53 from the adjoining lands. The right of working adjoining collieries and carrying coal therefrom to the surface through the shaft sunk in plaintiff’s land, is one which defendant can only claim by express grant. Such method of working the adjoining colliery is termed, in the English books, working by “outstroke,” and the grantee or lessee of a mine, independent of the surface, but with the right of working, cannot use the granted or demised mine for the purpose of carrying coal from his other collieries to the surface unless such user is warranted by the terms of his grant. MacSwinney on Mines, pp. 238, 239.
The importance to the mine operator of this method of working the mine is obvious, as it enables him to avoid the great expense of sinking separate shafts.
It is, therefore, carefully stipulated for in the instrument now under consideration (here followed a criticism on the referee’s opinion and an exhaustive analysis of the agreement, and a citation as bearing on its construction of the following authorities:—Phenix Insurance Co. v Continental Insurance Co., 87 N. Y. 400-407 ; Greffing v. First Presbyterian Society of Syracuse, 56 Barb 114-118).
II. Defendant is entitled at any time to connect the workings in the Genet property with its .own workings in adjacent lands. The acts which defendant has done in. relation to the Genet property, and which, by that clause of the judgment now under consideration it is commanded to undo, it justifies upon two grounds: First—That the contract between the parties expressly authorizes them. Second—That the right to do them, in the absence of express authority, is implied from the estate in the coal and other rights which are expressly granted. (1.) Express authority is given defendant to extend its workings to adjacent lands. (2.) The right to connect the workings in the Genet property with the workings in defendant’s other collieries is implied from the nature of the estate in the coal and other *54 rights granted to defendant, (a.) Defendant is seized in fee of each stratum of coal as a separate parcel of land. It is settled law that coal and other minerals may be separated in title so as to constitute a parcel of land separate and distinct from the surface. MacSwinney on Mines, 27; Bainbridge on Mines (4th ed.) 28; Caldwell v. Fulton, 31 Penn. St. 475; Caldwell v. Copeland, 37 R). 427; Armstrong v. Caldwell, 53 Ib. 284, 287. It is also settled law, especially in Pennsylvania, that a grant of the right to take all the coal in a piece of land, without limit as to time, is a grant of an estate in fee in the coal' as a separate parcel of land. Caldwell v. Fulton, supra ; Caldwell v. Copeland, supra; Armstrong v. Caldwell, supra ; Kier v. Peterson, 41 Penn. St. 357; Scranton v. Phillips, 94 Ib. 15; Sanderson v. City of Scranton, 105 Ib. 469 ; D., L. & W. R. R. Co. v. Sanderson, 109 Ib 583; Eley’s Estate, 2 Kulp 277; Fairchild v. Fairchild, 7 Cent. Rep. 873 ; Chester Emery Co. v. Lucas, 112 Mass. 424 ; Massot v. Moses, 3 S. C. (N. S.) 168.
That the instrument of conveyance uses the technical terms of a lease, makes no difference. The fact that the deed contains provisions under which it is possible that a part of the coal may revert to the grantors does not take away from the estate granted the character of an estate in fee, although such estate may perhaps be a base fee rather than a fee simple. 1 Wash-bum Real Property, 52, §§ 35, 36 ; 2 Bl. Comm. 109. (b.) Defendant may make -what excavations it will within the limits of the coal—that being its own land— and may use such excavations as a thoroughfare to and from its other collieries. Duke of Hamilton v. Graham, L. R. 2 Scotch App. 166; Proud v. Bates, 34 L. J. [N. S.), Ch. 406. (c.) Assuming that the deed of March 28, 1864, is a lease of the coal, and defendant a technical lessee, it still has the right of connecting the workings in the demised property with its adjoining collieries. It is settled law that the lessee of a coal mine has the right, in the absence of express covenant to the con *55 trary, to work the demised mine from an adjacent colliery. This method of working is termed in the English books working by “instroke.” MacSwinney on Mines, p. 231. Working by instroke is prima facie the right of every mining lessee, even when the lease contains an express covenant to work in a proper and workmanlike manner. MacSwinney on Mines, 231; Whalley v. Ramage, 10 Week. Rep. 315; S. G., 8 Morrison’s Min. Rep. 52; Lewis v. Fothergill, L. R., 5 Ch. App. 103 ; Jegon v. Vivian, L. R., 6 Ch. App. 742; S. C., 8 Morrison’s Min. Rep. 628. (d.) Defendant is under no obligation to plaintiff to prevent the water which naturally collects in the workings which surround the Genet property from flowing by force of gravity through the working and to the “ Marvin ” shaft. Bainbridge on Mines, 4th ed. p. 294 ; MacSwinney on Mines, p. 404; Smith v. Kenrick, 7 C. B. 515; Baird v. Williamson, 15 C. B. (N. S.) 375, 388, 389; The Scots Mines Co. v. Leadhills Mines Co., 34 Law Times (Reports), p. 34 (Oct. 15, 1859); Wilson v.. Waddell, L. R., 2 App. Ca., 95; Crompton v. Lea, L. R., 19 Eq. Ca., 115, 123; Penna. Coal Co. v. Sanderson, 113 Penn., 126, 146 ; Jones v. Robertson, 116 Ill., 543, 552. The water is a sort of “common enemy” against which each owner must protect himself, and the only duty which the miner on the upper level owes to his neighbor on the lower, is to carry on his operations with ordinary care and skill. (<3.) No water is brought to the Marvin shaft by any artificial means employed or set in motion by defendant, except that defendant by extending its workings has removed the natural barriers, (f.) No tunnels or other underground channels have been constructed by defendant connecting the Genet property with other lands except such as have been constructed in the ordinary and proper course of mining, (g.) Defendant has the right to use the workings at the “ Marvin shaft” for the purpose of pumping and removing from the mine all water which collects in the workings *56 around that shaft, including all water which runs into those workings by gravitation from the workings in adjoining lands.
III. Defendant is entitled to use the surface of plaintiff’s land for the deposit of all the culm produced by its mining operations carried on at and through the “Marvin Shaft,” whether such culm be the product of the Genet property or not. This right must of course depend on the terms of the contract between the parties. It is expressly given by the contract. Even if it had not been expressly granted, it would be implied in the grant which confessedly plaintiff has made to defendant, that of maintaining the “Marvin Shaft” and breaker as a working colliery, with reference to all the adjacent lands of defendant. Unless this defendant has the right to deposit on plaintiff’s land the refuse of the colliery, the right clearly and expressly granted of maintaining that colliery after the coal in plaintiff’s land is exhausted, is nullified. The rule, therefore, fairly applies, that plaintiff having expressly granted the one, has by implication granted the other. Broom’s Legal Maxims, 6th English ed., 445; MacSwinney on Mines, 274; Bushnell v. Proprietors, etc., 31 Conn. 150; Charles Eiver Bridge v. Warren Bridge, 11 Pet., 420, 630.
IY. Plaintiff has not made out a case which entitles her to equitable relief by way of injunction. (1.) The court should not interfere by mandatory injunction to compel defendant to close up the headings and gangways leading from the “Marvin Shaft ” to other lands, (a.) No proof has been offered to show that the past existence of these headings and gangways has caused, or that their existence in the future will cause, any damage irreparable or otherwise to the plaintiff.
. Possible future damage does not authorize an injunction. Morgan v. City of Binghamton, 102 N. Y. 500 ; People v. Canal Board, 55 Ib., 390, 397. The very foundation, therefore, of relief by injunction—actual and irreparable injury to the plaintiff—is wholly want *57 ing in the present case. T. & B. R. R. Co. v. B. H. T. & W. Ry. Co., 86 N. Y. 107, 126. (5.) Plaintiff is estopped from denying the right of defendant to make and maintain the tunnel connecting the “ Leggett’s Creek” and “Marvin” shafts by reason of her laches, acquiescence and delay. Bassett v. Salisbury Mfg. Co., 47 N. H. 426, 441; Gt. W. R. R. Co. v. O. W. & W. R. R. Co., 3 D, G. M. & G. 341; Bermingham Canal Co. v. Lloyd, 18 Ves. Jr. 515; S. G., 8 Mining Rep. 166; Parrott v. Palmer, 3 M. & K. 632, 640; Jacox v. Clark, Walker (Mich.) 249; Fuller v. Melrose, 1 Allen 166; Pomeroy Eq. Jur., § 1359. (d.) The injunction compelling defendant to close the headings and gangways connecting the “Marvin Shaft” with the other lands of defendant is of no benefit whatever to plaintiff, while it imposes upon defendant a heavy burden of expense and inconvenience.
An injunction ought not to be granted when it will operate to inflict serious loss on one party while the injury resulting to the other from the acts complained of, is comparatively trifling. Bassett v. Salisbury Co. 47 N. H. 426, 438; Harkinson’s Appeal, 78 Penn. 196; Bichard’s Appeal, 57 Ib. 105; Wood v. Sutcliff, 2 Sim. (N. S.) 163, 168; Thorn v. Sweeney, 12 Nev. 251. 2. Defendant should not be enjoined from mining coal from other lands through the “Marvin Shaft.” (a) The continuance of such mining will do no damage to the plaintiff. The cessation of it will be of no benefit to her while it will cause great damage to defendant. The injunction which,was granted in this case was apparently awarded on the theory that if defendant were prevented from mining its own coal “upon which it pays nothing,” it would then proceed to mine more rapidly the coal on which it pays royalty to plaintiff. And the process of this court has been placed in the hands of plaintiff to be used as a club to compel defendant to do what the Beferee was compelled to hold it had, “in precise and emphatic phrase,” relieved itself from *58 doing. The preventive process of equity will not be granted for such a purpose. Wood v. Sutcliff, 2 Sim. (N. S.) 163, 169; Bassett v. Salisbury Co., 47 N. H. 426, 441; Edwards v. Allouez Min. Co. 37 Mich. 46. (b) Plaintiff knew for years before this suit was brought and at the time the “Marvin Shaft” and breaker, with its appurtenances were being constructed, that they constituted a colliery capable of handling a much larger quantity of coal than her land could supply, and allowed defendant to proceed without objection: testimony of Broderick, taken in 1878, fols. 469, 470, 471. A court of equity ought not now to interfere, but should leave her to such remedy as the law affords.
V. The award of damages contained in the judgment is erroneous. These damages were awarded on the theory that a portion of plaintiff’s land has been illegally covered with culm, and defendant is’ required to pay the full value of two acres of land; but the judgment does not provide that on receiving such payment plaintiff shall convey the land so paid for. It is evident that the referee, in reaching this conclusion, and also in receiving, against defendant’s objection, the testimony as to the value of the surface land, acted upon an erroneous theory as to the measure of damages. Uline v. N. Y. C. & H. R. R. Co., 101 N. Y. 98; Silsby Mfg. Co. v. State, 104 N. Y. 562, 569.
By the Court.—Sedgwick Ch. J.
Excepting in a single respect, the findings of fact and the opinion of the referee have convinced me that the judgment ordered by him should stand.
I think, however, that the enjoining part of the judgment should be changed by inserting in the second subdivision of the judgment immediately before the words “ until all the coal which it is authorized” the following words: “ excepting during such times as,, defendant shall use said shaft, breaker, machinery or other structures, for the mining, preparing and forwarding coal in *59 and from plaintiff’s said land to the amount or quantity such shaft, breaker, machinery and other structures, are or shall be adapted to mine, prepare and forward, or”
As thus modified the judgment is affirmed without costs to either party.
Notice of settlement of the order to be entered is to be given.
Freedman, J., concurred.